**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| IBI Palm Beach, LLC | : | Case No. 14-_____ (  ) |
|  | : |  |
| Debtor. | : |  |

**DECLARATION OF BRADLEY T. PRADER**
**IN SUPPORT OF FIRST DAY MOTIONS**

I, Bradley T. Prader, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of IBI Palm Beach, LLC, a Florida limited liability company and the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor").  In this capacity, I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records.

2. On the date hereof (the "Petition Date") the Debtor filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor intends to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this chapter 11 case and, as of the date of the filing of this declaration (the "Declaration"), no official committees have been appointed or designated.

3. To enable the Debtor to reduce the adverse effects of the commencement of this chapter 11 case on its organization, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" and collectively, the "First Day

Motions"). The First Day Motions seek relief intended to allow the Debtor to transition into chapter 11 and minimize disruption, thereby preserving and maximizing the value of the Debtor's estate.

4. I am familiar with the contents of each First Day Motion (including the exhibits and schedules in support thereof), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

5. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6. Part I of this Declaration describes the Debtor's history and operations, its capital and debt structures and the circumstances surrounding the commencement of this chapter 11 case. Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

## I.     BACKGROUND

### A.     The Debtor's History and Corporate Structure

7.     IBI Palm Beach, LLC ("IBI" or the "Company") is an entertainment company that operates cruise-based casino entertainment out of the Port of Palm Beach, marketing to the 5.3 million adults (age 21+) living within the West Palm Beach metropolitan area under the trade name Island Breeze Casino.

8.     The Debtor was formed as an LLC on April 17, 2013, under the laws of the State of Florida. Its initial member was IBI Palm Beach Holdings, LLC ("Holdings"), which, at that time, owned 100% of the membership interests in IBI. Currently, Holdings owns 60% of the Company. The remaining 40% is owned by CND International, Inc. ("CNDI").

9.     IBI is managed by Holdings, which has appointed officers to run the day-to-day operations of the Company. Due to certain logistical difficulties described below, the Company has suspended its daily sailing operations and temporarily laid off of its approximately 250 employees, with the exception of 8 individuals comprising critical management, vessel crew, and administrative personnel.

### B.     The Debtor's Capital and Debt Structure

10.     On or about May 15, 2013, IBI entered into a Charter Purchase Agreement of the Cruise Ship Black Diamond, as amended (the "Charter Agreement") with Nurmi Property, LLC ("Nurmi"). The Charter Agreement effectively provides for the installment sale of IBI's vessel, the Island Breeze II (ex Black Diamond) (the "Vessel"). The Charter Agreement provides for a gross purchase price of the Vessel of six million dollars ($6,000,000), less certain credits of approximately ($200,000), for a net purchase price of approximately five million eight hundred thousand dollars ($5,800,000) (the "Purchase Price").

11. In connection with the Charter Agreement, the Company also paid certain expenses on Nurmi's behalf and received additional credits for repairs, all of which reduced the amount owed to Nurmi under the terms of the Charter Agreement. The term of the Charter Agreement continues until the earlier of August 1, 2018, or the payment in full of the Purchase Price.

12. Beginning on June 1, 2013, the Company is required to pay Nurmi a base payment on the first day of each month in the amount of fifteen thousand dollars ($15,000). Additionally, the Company is required to make additional payments to Nurmi in an amount equal to fifty percent (50%) of the net operating profits of the Company, less deductions for operating expenses, taxes, capital expenditures and an operating reserve allowance.

13. On or before August 1, 2015, the Company is obligated to have made an aggregate of one million dollars ($1,000,000) in payments to Nurmi. On or before August 1, 2016, the Company is obligated to have made an aggregate of two million two hundred thousand dollars ($2,200,000) in payments to Nurmi. On or before August 1, 2017, the Company is obligated to have made an aggregate of three million six hundred thousand dollars ($3,600,000) in payments to Nurmi. On or before August 1, 2018, all payments due from the Company to Nurmi shall be paid in full. All such payments referenced above are counted as payments against the Purchase Price of the Vessel.

14. As of the Petition Date, the Debtor is obligated to Nurmi in the approximate aggregate amount of $ 5,223,962.

15. On or about November 12, 2013, IBI entered into (i) a certain Master Slot Lease Agreement (the "Master Slot Agreement") with SourcePoint, LLC ("SourcePoint"), pursuant to which the Company leases 200 slot machines and certain other fixtures and equipment, and (ii) a

4

certain Loan Agreement with SourcePoint in the principal amount of one million five hundred thousand dollars ($1,500,000). The Loan Agreement bears an interest rate of ten percent (10%) per annum and is payable as interest-only in arrears on the first day of each calendar quarter. It matures twenty-four (24) months after the Island Breeze Casino began operating, but in any event no later than January 1, 2016.

16. In connection with the Loan Agreement, the Debtor and SourcePoint entered into that certain Security Agreement dated November 12, 2013, pursuant to which SourcePoint asserts security interests in substantially all of the Debtor's personal property, including the Debtor's cash, cash equivalents, and deposit accounts.

17. The relative rights and priorities with respect to the Charter Agreement, the Loan Agreement, and the Master Slot Lease are governed by an Intercreditor Agreement dated on or about October 28, 2013, by and among SOUTHBank Federal Savings Bank, Nurmi, SourcePoint, and IBI. Among other things, the Intercreditor Agreement makes clear that SourcePoint's collateral "does not include the Vessel…including, but not limited to, the equipment, machinery, furnishings, goods, and all fixtures, located on the Vessel necessary for navigation and operation as a Vessel owned by Nurmi, or Nurmi's interest in the Charter Agreement."

18. As described below, on July 25, 2014, SourcePoint sent IBI notice of default and acceleration of the Loan Agreement and notice of default and termination of the Master Slot Agreement.

19. In connection with the Loan Agreement, the Company issued to SourcePoint a warrant to purchase up to 4% of the fully diluted membership interests of the Company at an exercise price of $0.01 per 1% membership interest, with the exercise period being between the

5

twenty-forth and twenty-fifth month after date-of-issue. To date, SourcePoint has not exercised the warrants.

20. In addition to the Charter Agreement, the Loan Agreement, and the Master Slot Agreement, the Company also guarantees the following debts (the "Guarantees"):

   a. a $1,500,000 Draw Down Promissory Note executed on July 30, 2014, between Holdings and CNDI. As of this date, the principle balance is $1,000,000. This note accrues at 7% interest per annum;

   b. a $500,000 Promissory Note executed on January 21, 2014, between Holdings and CNDI. This note accrues interest at 12% per annum; and

   c. a $400,000 Promissory Note executed on February 26, 2014, between Holdings and CNDI. This note accrues interest at 12% per annum.

21. These Guarantees are unsecured obligations.

C.  **Events Leading to the Commencement of this Chapter 11 Case**

22. On May 2, 2014, the starboard main engine of the Vessel sustained a catastrophic failure that required the Company to cease operations and overhaul the engine. Project operations were shut down for a period of twenty-one (21) consecutive days. During the month of May 2014, the Company experienced negative cash flow of approximately $1 million.

23. In early summer 2014, IBI recommenced operations for a brief period of time to accommodate previously booked events; however, shortly after this re-start, the Company again had to cease operations in order to prepare the Vessel to enter dry-dock and undergo a mandatory, bi-annual United States Coast Guard inspection.

24. Because of the scheduling availability of shipyards with a dry-dock to accommodate the width of the Vessel and lack of required funds, the dry-docking was delayed until mid-September 2014. During this delay, the prior vessel inspection term, which was on extension from April 2014 to June 30, 2014, lapsed. Consequently, the Coast Guard would not

permit the Vessel to carry passengers until successful completion of the bi-annual dry-dock inspection.

25.     As of the date of this Declaration, the dry-docking has been fully and successfully completed and the Vessel has a valid, current certificate of inspection to carry passengers.

26.     Due to the lengthy project shutdown while awaiting the dry-dock inspection, the Company did not generate any revenues from which it could meet its debt obligations to SourcePoint.  As such, on July 25, 2014, SourcePoint issued notice of default and acceleration of the $1,500,000 secured Loan Agreement, as well as a notice of default and termination of the Master Slot Agreement (together, the "Notices of Default").

27.     Prior to and after receipt of the Notices of Default, IBI was actively engaged in negotiations with SourcePoint to expedite a settlement, forbearance, or restructuring to enable IBI to re-launch the Vessel and return to profitable operations.  Negotiations between the Debtor and SourcePoint continue as of the date of this Declaration, but have not yielded a resolution.

28.     Thus, due to the Debtor's inability to re-launch and lack of liquidity absent a recalibrated debt structure, and in light of the many issues outlined above, the Debtor has made the difficult but necessary decision to seek the protections of chapter 11 in this Court.

**D.     Objectives of this Chapter 11 Case**

29.     In addition to restructuring debt, the Debtor filed this case to facilitate implementation of certain revitalizing strategies already underway.  IBI must achieve stability in order to attract investors, recall employees, resume operations, and generate positive cash flows.  When operating, IBI enjoys strong market share and expects that it can continue to do so.  IBI anticipates that its strong market position will enable a return to a healthy financial condition once it can re-launch its Vessel.  Undoubtedly, the continued viability of IBI's business is in the

best interests of its constituents, including employees, creditors, and customers. The Debtor intends to stabilize and reinforce that viability through these proceedings.

## II.     FIRST DAY MOTIONS

30. Concurrent with the filing of the chapter 11 petition, the Debtor has filed the First Day Motions. The Debtor requests that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in minimizing disruption in IBI's existing and anticipated operations and maximizing value for the benefit of all parties in interest.

31. The relief sought in the First Day Motions will diminish the adverse impact of the filing of this case on the Debtor, its existing employees, customers, and vendors. I believe that the relief sought in each of the First Day Motions is essential to enable the Debtor to make a seamless transition into chapter 11 and operate effectively as a debtor-in-possession. I believe that the First Day Motions are tailored to address those matters that require urgent and immediate attention by this Court in order to sustain the value and the viability of the Debtor's operation.

**A.     Motion of the Debtor for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "<u>Utility Motion</u>").**

32. In the ordinary course of business, the Debtor obtains electric and shore power service from the Port of Palm Beach ("<u>POPB</u>"), and telephone and internet services through Windstream Communications ("<u>Windstream</u>," and together with POPB, the "<u>Utility Providers</u>").

33. The Utility Providers service the Debtor's office space at POPB as well as the Vessel itself. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Indeed, interruption of utility services, even for a brief period of time, would disrupt the Debtor's efforts to re-launch

8

the Vessel and return to normal, daily operations.  Such a result could jeopardize the Debtor's reorganization effort and, ultimately, its operations and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during this chapter 11 case.

34. By the Utility Motion, the Debtor seeks the entry of interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtor's proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtor's proposed adequate assurance procedures; and (e) determining that the Debtor is not required to provide any additional adequate assurance, beyond what is proposed by this Motion.

35. Such relief is necessary to enable the Debtor to continue its business uninterrupted by threats of potential termination of, suspension or interruption in its utility services.  Because the Utility Providers, particularly POPB, administer essential shore power services to the Debtor's Vessel and offices, any interruption in service could have resounding negative effects on the business and undermine the Debtor's reorganization efforts.

36. Accordingly, I believe, and the Debtor submits, that the relief requested in the Utility Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest and, as such, should be approved.

**B.  Emergency Motion of Debtor to Pay Certain Pre-Petition Payroll and Various Employee Benefit Expenses Pursuant to 11 U.S.C. §§ 105(a)(1), 502(f) and 507(a)(4) (the "<u>Wages Motion</u>").**

37. To minimize the personal hardship that the employees would suffer if prepetition employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtor's already-reduced workforce during this critical time, by the Wages Motion, the Debtor seeks authority to pay and honor, in its sole discretion, certain pre-petition claims for, among other items: wages, salaries, federal and state withholding taxes and other amounts withheld, workers' compensation benefits, vacation time, sick leave, long-term and short-term disability coverage and all other benefits that Debtor has historically provided in the ordinary course of business.

38. Additionally, the Debtor requests confirmation that the Debtor may, in its sole discretion, continue its prepetition employee benefits programs in the ordinary course of business. In an abundance of caution, the Debtor requests the right to modify, change, and discontinue any of its employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during this chapter 11 case in its sole discretion, without the need for further Court approval.

39. The Debtor's employees are the lifeblood of the Debtor's business. Due to recent operational challenges, those employees are few in number at this time, but invaluable to the Debtor's organization. Accordingly, it is my belief that there is ample justification for the relief requested in the Wages Motion and that the granting of such relief is in the best interests of the Debtor, its estate, and all parties in interest to this case.

**C.  Emergency Motion of Debtor for Authorization to Maintain Debtor's Existing Bank Accounts and Business Forms (the "<u>Bank Accounts Motion</u>").**

40. The Debtor seeks entry of an order authorizing the Debtor to maintain its existing Bank Accounts and Business Forms. The Debtor also requests that the Court authorize the Debtor's banks to continue to maintain, service and administer the Bank Accounts (as that term is defined in the Bank Accounts Motion).

41. The Debtor further requests that it be authorized to continue to use all correspondence and business forms, including books and records which existed immediately before the Petition Date, as the changing of Business Forms would be costly, burdensome, and disruptive at this time.

42. I believe that the relief requested in the Bank Accounts Motion is essential to facilitating a seamless transition into chapter 11. Accordingly, I believe that approval of the relief sought in the Bank Accounts Motion is in the best interest of the Debtor's estate, its creditors, and all parties in interest.

**D.    Emergency Motion of the Debtor for Interim and Final Orders (a) Authorizing the Debtor to Use Cash Collateral of Existing Secured Lender and Granting Adequate Protection for Use and (b) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing (the "Cash Collateral Motion")**

43. The Debtor seeks entry of an interim order authorizing the Debtor to use the Cash Collateral of SourcePoint (as defined in the Cash Collateral Motion, the "Prepetition Lender"), granting adequate protection, and prescribing the form and manner of notice and setting the time for the final hearing on the Cash Collateral Motion.

44. In the absence of access to Cash Collateral, the Debtor's ability to re-start operations would be hampered and the value of SourcePoint's collateral would be thoroughly diminished. Indeed, without the use of Cash Collateral, the Debtor will likely suffer irreparable

harm, the business operations will be fully shuttered, and all going concern value of the enterprise will be lost.

45. As set forth fully in the Cash Collateral Motion, the Debtor has proposed a Budget that it believes is reasonable, and has offered to adequately protect SourcePoint's interests.

46. Therefore, I believe and the Debtor submits that the use of Cash Collateral on the terms set forth in the proposed Interim Order and corresponding Budget is in the best interests of the Debtor, SourcePoint, and all parties in interest. As such, the relief requested in the Cash Collateral Motion should be granted.

### III.    CONCLUSION

47. For all of the foregoing reasons and those more fully set forth in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as the Court may deem appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information, and belief as set forth in this Declaration.

Dated: November 6, 2014

                                                      Bradley T. Prader
                                                      Chief Executive Officer
                                                      IBI Palm Beach, LLC