UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

IBI Palm Beach, LLC,　　　　　　　　　　　　　Case No.  14-34729-BKC-EPK

　　　　　　　　　　　　　　　　　　　　　　　Chapter 11

　　　　　Debtor.
_____/

## SOURCEPOINT, LLC'S MOTION TO DISMISS CASE AS BAD FAITH FILING OR, ALTERNATIVELY, MOTION FOR RELIEF FROM AUTOMATIC STAY

Secured Creditor, SourcePoint, LLC, ("SourcePoint"), through counsel and pursuant to 11 U.S.C. §§ 362 and 1112, files this *Motion to Dismiss Case as Bad Faith Filing or, Alternatively, For Relief From Automatic Stay* seeking to dismiss the instant petition filed by Debtor, IBI Palm Beach, LLC ("Debtor"), or alternatively, seeking relief from the automatic stay to continue its foreclosure sale, and in support thereof states as follows:

## INTRODUCTION

This is not a case about a Debtor who experienced bad luck because of a "catastrophic engine failure" and a required Coast Guard approval.  This is a case about dysfunctional and inept management bleeding the Debtor dry. This case was filed the on the eve of an Article 9 sale of substantially all of the Debtor's assets to delay and distract from a two-party dispute between the Debtor and SourcePoint.  The Debtor has never made a payment to SourcePoint on its $1.5 million loan obligation or its lease of 200 slot machines and associated equipment.  Based upon the Debtor's profit and loss statements and paragraph 5 of the Debtor's Chapter 11 Case Management Summary (ECF No. 29), **the Debtor has sustained over $3 million in net operating losses since January 2014, demonstrating that this case is dead on arrival**, with $1.177 million of said

{1917/000/00274333}

losses occurring before the "engine failure." Moreover, the Debtor did not stop operating in June 2014 because of the Coast Guard inspection, but because the Debtor was hemorrhaging from operating losses. As discussed below, dismissal or stay relief is warranted based upon the evidence showing that the instant filing is in bad faith, lack of adequate protection of SourcePoint's collateral, lack of equity in the Debtor's assets and the Debtor's inability to confirm a plan of reorganization.

## BACKGROUND

1. The Debtor is an entertainment company that operated and provided cruise ship-based casino entertainment out of the Port of Palm Beach.

2. The Debtor's primary asset is a Charter Purchase Agreement with Nurmi Property, LLC ("Nurmi"), in which Nurmi agrees to charter to the Debtor a casino cruise ship f/k/a Black Diamond (the "Vessel"). Upon payment of $6 million, Nurmi shall convey full title and ownership of the Vessel to the Debtor.

3. On November 6, 2014 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 petition under the Bankruptcy Code (the "Petition") (ECF No. 1).

4. The bankruptcy filing effectively derailed an Article 9 foreclosure sale of substantially of the Debtor's assets that was scheduled for November 7, 2014 at 10:00 a.m.

5. By way of the instant motion, as will be more fully demonstrated below, the Debtor's Petition must be dismissed as it evidences all the applicable factors of a bad faith filing. Alternatively, SourcePoint requests this Court grant it full and complete relief from the automatic stay, so that SourcePoint may continue to pursue its rights and remedies under Florida law.

**PRE-PETITION HISTORY**

6. SourcePoint loaned an original principal amount of $1,500,000.00 (the "Loan") to the Debtor in November 2013 to finance the Debtor's development and operation of a gaming facility in Palm Beach County, Florida on board the Vessel. In connection with this loan, the parties entered into several related agreements including the Loan Agreement, the Secured Promissory Note, the Security Agreement, the Assignment of Revenues Agreement, the Attornment Agreement, and the Deposit Control Agreement. Attached here to as **Composite Exhibit "A"**.

7. The Loan is secured by substantially all of the Debtor's assets, including the Charter Agreement.

8. The Loan calls for ten percent (10%) interest only payments to be made quarterly beginning on January 1, 2014.

9. The parties also entered into the Master Lease Agreement (the "Lease") on November 12, 2013 under which SourcePoint leased 200 slot machines and associated equipment to the Debtor. The Lease is attached hereto as **Exhibit "B"**.

10. The Lease required the Debtor to pay basic rent of 20% of the winnings from the slot machines every two weeks beginning no later than March, 2014. Minimum payments are scheduled in the lease every quarter less basic rent paid by the Debtor. Said minimum payments were to begin on April 1, 2014.

11. The Debtor originally forecasted that it would begin sailing thirty (30) days after closing on the Loan. However, due to poor management, sailing did not begin for four months on March 15, 2014.

12. Because management burdened the Debtor with excessive salaries and travel expenses, lavish cars, and Florida rental homes, the Debtor sustained losses of $1.177 million from January through April and never made a payment on the Loan or the Lease. A copy of the Debtor's Income Statement for January – April, 2014 is attached hereto as **Exhibit "C".**

13. On April 22, 2014, SourcePoint noticed the Debtor's default on the Loan and increased the interest rate to the default rate of 24%. Said notice is attached hereto as **Exhibit "D"**.

14. On April 25. 2014, SourcePoint noticed the Debtor's default on the Lease for failing to make rent payments and providing the required financial reporting. SourcePoint requested that said defaults be cured by 5 pm EST on May 1, 2014. The defaults were never cured. A copy of said notice is attached hereto as **Exhibit "E"**.

15. In late April 2014, the Debtor began searching for additional capital due to its massive losses and inability to pay SourcePoint.

16. Then, in the first week of May 2014, an engine on the Vessel required repair, causing the Debtor to stop operating for two and a half weeks.

17. The Debtor began operating again on May 17, 2014 and incurred over $2 million in losses that month according to paragraph 5 of the Chapter 11 Case Management Summary (ECF No. 29).

18. Knowing that the Vessel required Coast Guard approval on June 30, 2014, and in order to stop the hemorrhaging of cash, the Debtor stopped operating in mid-June.

19. Apparently, in late July 2014, the Debtor enticed Ms. Christine C. Storey to infuse $1.5 million into the Debtor through her company, Cnd International, Inc.

20. Despite said investment, the Vessel still has not resumed sailing and the Debtor has failed to make a payment on SourcePoint's obligations.

21. In late July 2014, the parties attempted to negotiate a workout of the Debtor's obligations to SourcePoint.

22. While continuing to negotiate, SourcePoint also continued to pursue its rights and remedies, and on July 25, 2014, SourcePoint accelerated the balance of the loan, canceled the lease and accelerated the balance due on the lease pursuant to the notices attached hereto as **Composite Exhibit "F"**.

23. On August 4, 2014, SourcePoint scheduled an Article 9 sale for September 12, 2014 of all the Debtor's assets, including the Charter Agreement. A copy of said notice is attached hereto as **Exhibit "G"**.

24. On August 22, 2014, the Debtor sued SourcePoint by filing a complaint in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No. 2014CA010382 (the "State Court Lawsuit"), in which it sought to stay the Article 9 sale and compel arbitration pursuant to the loan documents. An emergency motion for temporary injunction was filed by the Debtor on August 29, 2014 to stay the foreclosure sale.

25. During the State Court Lawsuit, the parties continued to negotiate a potential settlement and SourcePoint agreed to postpone the Article 9 sale until October 13, 2014, and then again to November 7, 2014.

26. The emergency hearing on the injunction motion never took place, as the Debtor dismissed the State Court Lawsuit on October 14, 2014, the same date that discovery was due to SourcePoint in which the Debtor would have had to concede its default and that it never made a payment on the obligations it owes to SourcePoint.

27. In order to continue to frustrate SourcePoint's efforts to enforce its rights and remedies under the loan documents and the Lease, the Debtor filed for Chapter 11 bankruptcy on November 6, 2014, the day before the scheduled Article 9 sale of substantially all the Debtor's assets.

## MEMORANDUM OF LAW

### A. Cause Exists to Dismiss the Case

28. Under § 1112(b)(1), after notice and a hearing, the Court shall dismiss or convert a case for "cause," whichever is in the best interests of creditors and the estate, unless the Court determines that the appointment of a trustee under § 1104 is in the creditors' and estate's best interests. 11 U.S.C. § 1112(b)(1).

29. Section 1112(b)(4) lists several factors that constitute cause; however, the list is not exhaustive, and the Court "may consider other factors and equitable considerations in order to reach an appropriate result in the individual case." *In re Schriock Constr., Inc*., 167 B.R. 569, 575 (Bankr. D.N.D. 1994) (citing H.R. Rep. No. 95-595, at 405–06 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6361–62).

30. A finding that a single ground for cause under § 1112(b) has been met is sufficient for the Court to dismiss or convert the case. *In re Reagan*, 403 B.R. 614, 621 (B.A.P. 8th Cir. 2009). The only exception to relief allowed under this section is where "unusual circumstances" discussed in 11 U.S.C. § 1112(b)(2) exist; there are no such unusual circumstances in this case.

### 1. The Instant Petition was Filed in Bad Faith

31. Courts in the Eleventh Circuit have consistently found that "bad faith" constitutes "cause" for dismissal under 11 U.S.C. 1112(b). *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988) (listing factors evidencing bad faith); *see also In re State Street Houses, Inc.*, 356

F.3d 1345 (11th Cir. 2004) (affirming dismissal on "bad faith" grounds of petition filed by single asset real estate Chapter 11 debtor with few creditors, and applying *Phoenix Piccadilly* factors); *In re Midway Inv., Ltd.*, 187 B.R. 382, 388 (Bankr. S.D. Fla. 1995) (noting that *Phoenix Piccadilly* factors are appropriate in single asset cases).

32. Although the Eleventh Circuit has not enunciated a specific standard for determining when a petition has been filed in bad faith, it has identified a number of factors which evidence a bad faith filing, including the following:

   a. the debtor has only one asset;

   b. the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

   c. the debtor has few employees;

   d. the debtor's property is the subject of a foreclosure action as a result of arrearages on the debt;

   e. the debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in the pending foreclosure proceedings;

   f. the timing of the debtor's bankruptcy filing evidences an intent of the debtor to delay or frustrate the legitimate efforts of the secured creditors to enforce their rights; and

   g. the lack of a realistic possibility of an effective reorganization.

*In re State Street Houses, Inc.*, 356 F.3d 1345, 1347 (11th Cir. 2004); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d at 1394-1395.

33. This list of factors is not exhaustive, and the factors are not meant to be rigidly applied. *See State Street Houses*, 356 F.3d at 1348. Instead, these factors are "appropriate guidelines" when evaluating whether a chapter 11 petition filed in bad faith. Id. at 1347.

34. This case should be dismissed because the Debtor filed the petition in bad faith. The Debtor's bad faith is evidenced by the following facts:

a. The Debtor has only one asset of value, the Charter Agreement, which is encumbered by SourcePoint's lien;

b. The Debtor has only one employee that is not an insider. Including officers, the Debtor has three employees;

c. The Debtor's assets, including the Charter Agreement, were scheduled for an Article 9 foreclosure sale on November 7, 2014 at 10:00 am;

d. The Debtor's financial problems, almost exclusively involve a dispute between the Debtor and SourcePoint, which dispute can be resolved outside of bankruptcy in state court, as evidenced by the State Court Action;

e. The timing of the Debtor's bankruptcy filing, the day before the Article 9 foreclosure sale, evidences the Debtor's intent to delay and frustrate SourcePoint's legitimate efforts to enforce its rights; and

f. As set forth in more detail below, the Debtor has no realistic possibility of an effective reorganization. The Debtor is using this bankruptcy solely to frustrate SourcePoint's efforts to exercise its rights and remedies under its loan documents, including its right to foreclose on the Charter Agreement. The Debtor also hopes to use this bankruptcy to avoid the Lease and its $11 million accelerated obligation to SourcePoint under a fraudulent transfer theory, which could be done in state court.

35. Because the facts of this case meet all of the factors set forth as bases for a bad faith dismissal, this Court should dismiss this case as a bad faith filing.

**2. Cause Exists to Dismiss this Case Under 11 U.S.C. § 1112(b)(4)(A)**

36. Under Section 1112(b)(4)(A) of the Bankruptcy Code, a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" constitutes cause. A substantial and continuing loss to or diminution of the estate can be shown "by demonstrating that the debtor incurred continuing losses or maintained a

negative cash flow position after the entry of the order for relief." *In re Schriock Constr., Inc.*, 167 B.R. at 575.

37. This Debtor has failed to make a single payment to SourcePoint and has lost money at astonishing rates. By the Debtor's own admission through the sworn declaration of Bradley T. Prader (ECF No. 5), the Debtor lost $2 million in the month of May this year. As discussed above, the Debtor's financials also reveal that it lost over $1.177 million prior to the asserted "catastrophic engine failure."

38. As of the Petition Date, the Debtor had approximately $15,000 in the bank, and did not have sufficient funds to pay the expenses outlined in its cash collateral motion, which resulted in the hearing on said motion being continued at the Debtor's request.

39. SourcePoint is skeptical of the existence of any equity cushion in the Charter Agreement given that the only appraisal in its possession shows the value of the Vessel as $4 million, a copy of which is attached hereto as **Exhibit "H"**. Moreover, upon information and belief, the Vessel is encumbered by liens in favor of Southbank FL and Southbank MS in the amount of $1 million and may be encumbered by other maritime liens. The Vessel also had two engine failures since May. If there is an equity cushion, it is being eroded by the accrual of default interest on SourcePoint's Loan.

40. Moreover, the Debtor has no reasonable likelihood of rehabilitation.

41. A reasonable likelihood of rehabilitation refers "to the debtor's ability to restore the viability of its business." *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004). A North Dakota bankruptcy court expounded on a court's charge in determining whether a chapter 11 debtor can rehabilitate:

> [R]ehabilitation necessarily hinges upon establishing a cash flow from which current obligations can be satisfied. It is thus incumbent upon the court in the instant case to determine whether [the debtor] can emerge as an economically viable enterprise capable of servicing its obligations under a plan. This finding in turn requires an assessment of the feasibility of the debtor's proposal for rehabilitation, as contained in the first modified plan of reorganization together with the disclosure statement, under a cramdown scenario. Such a discussion necessarily overlaps with an evaluation of certain confirmational prerequisites under § 1129 and consideration of whether it is reasonable to believe that the debtor will be able to effectuate a confirmable plan of reorganization under any scenario. *In re Schriock Constr. Inc.*, 167 B.R. at 576.

42.     It is unlikely that this Debtor will ever present a feasible Plan given the losses the Debtor has suffered to date.

43.     Furthermore, any plan is premised on the fact that the Debtor must prevail on its theory that the Lease can be avoided as a fraudulent transfer and SourcePoint's accelerated damages that exceed $11 million would be substantially diminished.  Otherwise, SourcePoint will control the secured and unsecured classes and block confirmation.

44.     Said facts, in conjunction with the substantial and continuing loss or dimunition of the Debtor's estate constitutes cause under 1112(b) sufficient to warrant dismissal of the case.

    **B.   Relief From Stay is Warranted**

45.     Pursuant to 11 U.S.C. § 362(d), the Court may, for cause, modify the automatic stay arising under 11 U.S.C. § 362(a) upon the filing of a voluntary petition for relief under the United States Bankruptcy Code. 11 U.S.C. § 362(d). Courts have long recognized that Congress intended that the automatic stay have broad application. However, the legislative history of § 362 indicates that Congress contemporaneously recognized that the stay should be lifted in appropriate circumstances. In pertinent part, Congress has stated:

> It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to

>leave the parties to their chosen forum and to relieve bankruptcy courts from many duties that may be handled elsewhere.

*In re Holtkamp*, 669 F.2d 505, 508 (7th Cir. 1982) (*citing In re Honosky*, 6 B.R. 667, 669 (S.D.W. Va. 1980), *citing* S. Rep. No. 989, 95th Cong., 2d Sess. 50, reprinted in [1978] U.S. Code Cong. & Ad. News 5836.

1. **Cause Exists Under § 11 U.S.C. §362(d)(1) to Lift Stay**

46.     The first ground for obtaining relief from the automatic stay provides that the Court shall grant relief by terminating, annulling or conditioning such stay "for cause". 11 U.S.C. §362(d)(1). Section 362(d)(1) specifically cites the "lack of adequate protection of an interest in property of such party in interest" as a basis for relief from stay for "cause".

47.     "[T]he secured creditor lacks adequate protection if the value of its collateral is declining as a result of the stay." *In re Elmira Litho, Inc*., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994); *Fed. Nat. Mortg. Ass'n v. Dacon Bolingbrook Associates Ltd. P'ship*, 153 B.R. 204, 209 (N.D. Ill. 1993). "It must, therefore, prove this decline in value - or the threat of a decline - in order to establish a prima facie case." *In re Elmira Litho, Inc*., 174 B.R. at 902 (footnote omitted). "Once the movant satisfies this initial burden, the burden shifts to the debtor to go forward with evidence, and ultimately, to prove that the collateral is not declining in value, or that the secured party is adequately protected through periodic payments, an equity cushion, additional or replacement liens or good prospects for a successful reorganization." *Id*.

48.     "A continued failure to make monthly payments under loan documents can constitute cause for granting relief from the automatic stay.... Typically, however, cause will only be found where the failure to make monthly payments corresponds with a nonexistent equity cushion." *In re Balco Equities Ltd., Inc.* 312 B.R. 734, 749 (Bankr. S.D.N.Y. 2004) *citing In re*

*James River Assocs.*, 148 B.R. 790 (E.D.Va.1992)(citations omitted) (affirming bankruptcy court's decision to lift the stay where "there was both a small or nonexistent equity cushion and a failure to make monthly payments for approximately 17 months (7 months since filing the bankruptcy petition)"). Even when a slight equity cushion exists, this does not constitute adequate protection where post-petition interest is accruing, and the debtor is not able to pay expenses as they come due. *Id. citing In re Fortune Smooth (U.S.) Ltd.*, 1993 WL 261478 at *6 (Bankr. S.D.N.Y. July 6, 1993) (lifting the stay "for cause," notwithstanding an equity cushion of 14.89%, i.e., the collateral was valued at $3.63 million and was encumbered by liens totaling $3.095 million).

49. The Debtor has never made a payment to SourcePoint on its obligations and has provided no evidence that it intends to do so in this Chapter 11. The Vessel has experienced problems with its engine and has required maintenance work since the Debtor entered into the Charter Agreement. Given that the Debtor does not currently generate income and only lost money when it operated, the Debtor does not have sufficient resources to maintain the Vessel. As a result, SourcePoint lacks adequate protection because there is a serious threat that the value of the collateral, including the Charter Agreement, is declining.

50. "Cause" also exists to terminate the automatic stay if a petition was filed in bad faith. *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *Albany Partners, Ltd. v. Westbrook*, 749 F.2d 670, 674 (11th Cir. 1984); *In re AXL Industries, Inc.*, 127 B.R. 482 (S.D. Fla. 1991), aff'd 977 F.2d 598 (11th Cir. 1992).

51. As set forth in the discussion above, SourcePoint requests that this Court grant SourcePoint full and complete relief from the automatic stay because the Petition was filed in bad faith.

**2.      Relief from Stay is Warranted under 11 U.S.C. § 362(d)(2)**

52.     Pursuant to Section 362(d)(2) of the Bankruptcy Code, the Court shall grant relief from the stay of an act against property of the Debtor if: (A) the Debtor does not have any equity in such property; and (B) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2).

    **a.      There is No Equity in the Property**

53.     The Debtor's primary asset is the Charter Agreement and the remaining assets primarily consist of leased equipment. The May 2012 appraisal values the Vessel at $4 million. With the Charter Agreement calling for $6 million worth of payments, liens on the Vessel of $1 million and possible other maritime liens, there is no equity in the Debtor's assets.

    **b.      The Property is not Necessary to an Effective Reorganization**

54.     Second, the assets securing the Loan are not necessary to an effective reorganization as an effective reorganization is not possible. A plan cannot be crammed down over the objection of SourcePoint which will control the secured and unsecured classes. Also, it is unlikely that the Debtor can present a feasible plan of reorganization. As a result, the second prong of 11 U.S.C. § 362(d)(2) is also met and relief from the automatic stay should be granted so that SourcePoint can reschedule its Article 9 foreclosure sale.

## CONCLUSION

In summary, SourcePoint has demonstrated "cause" for dismissal under 11 U.S.C. § 1112. Virtually all of the factors which courts should and do analyze in determining whether a Chapter 11 case has been filed in bad faith are present in the instant case. This Chapter 11 case should never have been filed. It does not further the objectives of the bankruptcy process but subverts that process. SourcePoint believes that dismissal of this case is appropriate and respectfully

requests that an order dismissing this case be entered, or alternatively, requests an order granting relief from the automatic stay to foreclose on its lien.

**WHEREFORE**, SourcePoint respectfully requests the entry of an order (a) dismissing the instant Chapter 11 case with prejudice, or alternatively, (b) granting relief from the automatic stay; and (c) for any further relief that the Court deems just and proper.

### CERTIFICATE OF COUNSEL

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served notice of electronic filing via CM/ECF to all parties registered to receive such service on November 18, 2014.

> **SHRAIBERG, FERRARA & LANDAU, P.A.**
> Attorneys for SourcePoint, LLC
> 2385 NW Executive Center Drive – Suite 300
> Boca Raton, Florida 33431
> Telephone: 561-443-0800
> Facsimile:  561-998-0047
> jpage@sfl-pa.com
> ependergraft@sfl-pa.com
>
> By: /s/ John E. Page
>     John E. Page
>     Fla. Bar No. 0860581
>     Eric Pendergraft
>     Fla. Bar No. 91927